## CHESAPEAKE & O. RY. CO. v. WOOD.
### No. 5979.

Circuit Court of Appeals, Sixth Circuit.
July 27, 1932.

James P. Wood, of Cleveland, Ohio (Wilson & Rector, of Columbus, Ohio, Tolles, Hogsett & Ginn, James P. Wood, and Thos. O. Nevison, all of Cleveland, Ohio, on the brief), for appellant.

R. B. Newcomb, of Cleveland, Ohio (Newcomb, Newcomb & Nord and W. K. Sullivan, all of Cleveland, Ohio, on the brief), for appellee.

Before MOORMAN, HICKS, and HICKENLOOPER, Circuit Judges.

HICKS, Circuit Judge.

Action under the Federal Employers' Liability Act (tit. 45, U. S. C. c. 2, §§ 51–59 [45 USCA §§ 51–59]) and the Boiler Inspection Act as amended June 7, 1924 (tit. 45, U. S. C. c. 1, § 23 [45 USCA § 23]) by Emma Wood, administratrix of the estate of E. E. Wood, deceased, against the Chesapeake & Ohio Railway Company, a Virginia corporation, to recover damages for his death. Judgment for plaintiff. Defendant appeals.

The Clifton Forge Division of appellant's railway extends between Hinton, W. Va., and Clifton Forge, Va. On the night of October 29, 1930, Wood was the head brakeman upon a freight train running from Hinton to Clifton Forge. This train was called a "pick-up" because it picked up and set out cars at stations along its route. At about 1:45 o'clock a. m. of the 30th the train made up of engine 1548, sixty-four cars, and a caboose, running eastwardly, arrived at Ronceverte, W. Va. Wood was riding the engine, and as the train passed "W. R. Cabin" near the west end of the Ronceverte yard and about one mile west from the point of the accident, he took the orders handed up to him by the operator there. After reading these orders he handed them to Payne, the engineer. They

were that the train should pick up five cars and set out thirteen at Ronceverte.

As the train proceeded eastwardly the rear brakeman, Mankey, cut off the caboose upon the east main, west of the west crossover, which connects the east main and the "Old Fill Out" track lying on the south side of and parallel with the east main. When the engine reached a point near the east crossover connecting the east main and the Old Fill Out, Wood took his lantern and stepped off on the south side. His purpose was to count and cut off the thirteen cars to be set out. The engine was then to push them backwardly through the crossover to the Old Fill Out and thence through another crossover to the "New Fill Out" track which paralleled the Old Fill Out. After Wood stepped off the engine the train ran forward until in the judgment of the engineer the thirteen cars to be set out had cleared the crossover. While the train was thus moving Payne looked back and last saw Wood apparently standing in the clear between the east main and the Old Fill Out tracks. The engine was then about eight or ten car lengths from Wood.

Appellant kept an engine and crew in the Ronceverte yards. The duties of this crew were to do the switching necessary, to fill out the east-bound pick-up with cars which had been left in the yard to be forwarded. When the train was thus made up the engine No. 1509, was used to push the pick-up train from Ronceverte eastwardly to Alleghany. Engine 1509 had been in this particular service nightly, except Sundays, for five or six months but was not equipped with a rear headlight. On the night of the accident this engine was waiting in a "pocket" in front of the roundhouse off the Old Fill Out track and east of the pick-up engine and train. When the engineer, Phillips, learned that the pick-up train was coming, he ran engine 1509 eastwardly through the switch and out upon the Old Fill Out track; then backing it westwardly at about ten or fifteen miles an hour, he passed engine 1548 and its train. He then backed through a crossover to the east-bound main and coupled the pick-up caboose to the rear of his engine. He continued to back to a crossover, then pulled through the crossover to the Old Fill Out, and thence through another crossover to the New Fill Out where the engine picked up twenty-five cars which by the necessary switching movements were to be coupled to the rear end of the pick-up train. With the train thus made up, engine 1509 was to push the pick-up train from Ronceverte to Alleghany.

While backing westwardly after leaving the pocket and just after passing engine 1548, engine 1509 struck and killed Wood while he was standing upon the Old Fill Out track near the east crossover. At the time of the accident engine 1509 was carrying a white lantern on the rear end but had no headlight. As engine 1509 was thus running backwardly the engineer testified he could see Wood's white lantern but was unable to see Wood himself. The rules of the Interstate Commerce Commission effective at the time are printed in the margin.[1]

Appellant challenges: (1) The denial of a directed verdict; (2) the instruction to the jury that rule 131 applied to the movements of engine 1509; (3) the submission to the jury of the question whether appellant had violated the Boiler Inspection Act; and (4) the failure of the court to dismiss the case for lack of venue. The first three grounds are considered together and depend for their determination upon the proper interpretation of the rules.

Appellant's theory is that the applicable rule is 129 (b) and that the movement of engine 1509 was a terminal movement and/or one to pick up a detached portion of its train. We are not in accord.

We think that rule 129 (b) applies to a locomotive making regular trips with a train from one point to another over the road and which is from necessity required to run backward for some portion of such trips. Assum-

[1] "129. (a) Locomotives used in road service.—Each locomotive used in road service between sunset and sunrise shall have a headlight which shall afford sufficient illumination to enable a person in the cab of such locomotive who possesses the usual visual capacity required of locomotive enginemen, to see in a clear atmosphere, a dark object as large as a man of average size standing erect at a distance of at least 800 feet ahead and in front of such headlight; and such headlight must be maintained in good condition.

"(b) Each locomotive used in road service, which is regularly required to run backward for any portion of its trip, except to pick up a detached portion of its train, or in making terminal movements, shall have on its rear a headlight which shall meet the foregoing requirements.

"(c) Such headlights shall be provided with a device whereby the light from same may be diminished in yards and at stations or when meeting trains.

"(d) When two or more locomotives are used in the same train, the leading locomotive only will be required to display a headlight.

"131. Locomotives used in yard service.—Each locomotive used in yard service between sunset and sunrise shall have two lights, one located on the front of the locomotive and one on the rear, each of which shall enable a person in the cab of the locomotive under the conditions, including visual capacity, set forth in rule 129, to see a dark object such as there described for a distance of at least 300 feet ahead and in front of such headlight; and such headlights must be maintained in good condition."

ing that there was no turntable or "Y" at Alleghany, this rule would require a rear headlight on engine 1509 from the time it started on its return trip from Alleghany. Upon such a trip the use of a rear headlight is excused upon only two contingencies, i. e., should a portion of the train become detached the engine may pick it up without displaying its rear light, and in purely terminal movements. From our viewpoint the evidence is not sufficient to bring the case within this rule and protect appellant by its exception.

Wood was not killed while engine 1509 was running backwardly to pick up any portion of its train which had become detached while upon a road trip of the nature described. Engine 1509 had not yet become a part of any train. The cars to be picked up were yet to be "built" into the train. These cars had never been "detached" from the train. The caboose standing upon the main line was still the caboose of the pick-up train. Upon the other hand we think that the indisputable nature of the evidence requires the conclusion that engine 1509 was being used wholly within the yards for the purpose of building or making up the train to be pushed to Alleghany. It was performing this service from the time it left the "pocket" until it was coupled to the pick-up as a pusher. Nor was it being operated in a "terminal movement." This means a movement at terminals to and from service without other immediate duties to be performed. The doing of switching in a yard is not, we think, such a terminal movement and an engine while so engaged is in "yard service."

We conclude therefore that there was no error in the instruction that rule 131 was applicable.

It is not seriously contended that the white lantern had illuminating power sufficient to satisfy the requirements of rule 131. The evidence was sufficient to take the case to the jury upon the question whether the use of it violated rule 131, which rule had the force and effect of a statutory provision (see Napier v. Atl. Coast Line, 272 U. S. 605, 612, 47 S. Ct. 207, 71 L. Ed. 432), and also upon whether the rule, if breached, was the proximate cause of the accident.

The court did not err in failing to dismiss the case for lack of venue. This matter came up as follows:

The petition alleged violations of both the Federal Employers' Liability Act and the Boiler Inspection Act. The answer admitted that the appellant and decedent were both en-

gaged in interstate transportation at the time decedent was killed and relied upon the defense of assumption of risk. It made no objection to the venue. In its charge to the jury the court limited the issue to whether there had been a violation of the Boiler Inspection Act. Appellant then permitted the case to proceed to a verdict without objection and made no question touching the venue until the motion for a new trial some days later. It then challenged the venue upon the ground that it was an "inhabitant" of Virginia and that under title 28, § 112, U. S. C. (28 USCA § 112), the suit should have been brought in the District Court of that state. Assuming that the objection was sound, it had been waived, if not by the general appearance of appellant, then certainly by its failure to make the objection when the court submitted the case to the jury solely upon the Boiler Inspection Act. See Burnrite Coal Co. v. Riggs, 274 U. S. 208, 211, 47 S. Ct. 578, 71 L. Ed. 1002; Central Trust Co. v. McGeorge, 151 U. S. 129, 135, 14 S. Ct. 286, 38 L. Ed. 98. The case of Rice v. Baltimore & Ohio R. R. Co., 42 F.(2d) 387 (C. C. A. 6) is not in point. Appellant did not make objection to the venue "at its first opportunity." Erie R. Co. v. Kennedy, 191 F. 332, 334 (C. C. A. 6).

Judgment affirmed.